[Civ. No. 324. Fourth Appellate District.—March 30, 1932.]

TWODI P. MOSESIAN et al., as Executrices, etc., Appellants, v. CROWN CLEANERS AND DYERS, INC. (a Corporation), et al., Respondents.

Barbour, Kellas & Backlund and Ray W. Hays for Appellants.

Christian Hoeppner and Wakefield & Hansen for Respondents.

MARKS, J.—This is an action for damages resulting from the death of Paul A. Mosesian and instituted by the executrices of his last will and testament on behalf of his heirs under the provisions of section 377 of the Code of Civil Procedure. At the trial, one son, Suren P. Mosesian, waived all claims for damages on his behalf.

The Crown Cleaners and Dyers, Inc., is a California corporation having its principal place of business in the city of Fresno. At the time of the accident involved here, Joseph A. Gallant was driving one of its delivery trucks as its employee and upon its business.

Butler and Chance Avenues are public highways in the county of Fresno which intersect each other at right angles. Butler Avenue runs in an easterly and westerly direction. At the northeast corner of the intersection the city of Fresno maintains its fair grounds, which are inclosed by a tight board fence about eight feet in height and built ap-

proximately upon the property lines bordering the two streets. The intersection is an obstructed intersection as defined by the provisions of the California Vehicle Act, and motor vehicles traversing it from either the north or the east are limited, by subdivision two of section 113 of this act, to a speed of fifteen miles an hour.

On the evening of April 6, 1929, deceased and his son Suren P. Mosesian were traveling in a Chrysler sedan, which was being driven by Suren, on Butler Avenue approaching the intersection from the east. At the same time Gallant was approaching the intersection from the north in a small model "T" Ford delivery truck. The two cars came into collision three or four feet westerly from the center of the intersection. A disinterested witness described the action of the Mosesian car as follows: "The next time I looked the cars apparently had collided, or something had happened, because the Chrysler seemed to be sort of standing right on its nose, right on the radiator. Q. With the rear wheels up in the air? A. With the rear wheels up in the air, yes. Q. When you saw it the Chrysler was nose down with the rear end up in the air? A. Yes. Q. What course did it take after that? A. The rear end sort of dropped over to my right, or to its left, that is, towards Chance, and it seemed to roll over sideways a couple of times. Q. Where did it come to rest? A. Well, when I got up there and stopped it was about the fourth tree down." There was a row of fig trees on the south side of Butler Avenue which were about twenty-four feet apart.

According to the testimony of Gallant, he brought his automobile to a stop, or nearly to a stop, about ten feet north of the intersection line and proceeded into the intersection at a speed of not more than fourteen miles per hour. He saw the Mosesian car approaching from his left at a high rate of speed which he estimated at not less than forty-five miles per hour. He brought his delivery truck to a complete stop with its front wheels at the northerly edge of the macadamized surface of the road approximately ten feet from the center line of Butler Avenue. The Mosesian car proceeded into the intersection at a high rate of speed, swerved to its right and came into contact with his left front wheel, breaking it off, rolled over and came to rest sixty or more feet westerly from the intersection. Gallant

further testified that the impact brought his arm into contact with the hand throttle, threw his foot from his clutch so that the Ford under its own power proceeded southerly across Butler Avenue, where it came to rest.

Suren Mosesian testified that he approached the intersection at about twenty-five miles per hour, and when a short distance east from it, took his foot off the throttle and coasted into the intersection at a speed of approximately eighteen miles per hour. When he was within about ten feet of the easterly intersection line he saw Gallant proceeding southerly in his Ford about one hundred fifty feet northerly on Chance Avenue. He paid no further attention to the Ford until his father gave an alarm of danger. He then saw the Ford, which was within a few feet of the rear of the Chrysler, and crashed into it, causing the accident. This testimony is flatly contradicted by the testimony of Gallant and the disinterested witness to whom we have referred. This witness placed the speed of the Mosesian car at not less than forty miles per hour. Paul A. Mosesian was thrown from the car and died as a result of the accident.

The jury returned a verdict in favor of respondents, from which appellants have prosecuted this appeal. ■ The sole ground urged as furnishing a reason for reversal of the judgment is a modification by the trial court of an instruction proposed by appellants. This instruction, with the modifying clause in italics, follows: ''If you find from the evidence in this case, guided by the instruction of the court, that Paul A. Mosesian died as the direct result of the injuries received by him in a collision between the automobile of the defendant Crown Cleaners and Dyers, Inc., and the automobile driven by Suren P. Mosesian—*and it is an admitted fact in the case that Paul A. Mosesian did die as a direct result of the injuries received in the collision*—and if you so find from the evidence, as explained by these instructions, that the automobile of the defendant, Crown Cleaners and Dyers, Inc., was being driven and operated in a negligent manner by the said Joseph A. Gallant, and that said injury and death were proximately and directly caused by such negligent operation of said automobile, then the plaintiffs are entitled to a verdict against said Crown Cleaners and Dyers, Inc., and said Joseph A. Gallant, notwithstanding that some one else's negligence, other than the negligence

of Paul A. Mosesian himself, may or may not have contributed to the collision, *unless you find that said Paul A. Mosesian and Suren Mosesian were, at the time of the accident, engaged in a joint enterprise as defined in these instructions."*

It must be admitted that the instruction, as modified, is not a model of correctness. The meaning of the last phrase of the instruction as it was proposed by appellants is rendered somewhat uncertain by the portion added by the trial court. However, we believe that this uncertainty was entirely removed by other instructions which the court gave to the jury.

The court fully and correctly instructed the jury upon the questions of negligence, contributory negligence, proximate cause, and joint enterprise. It instructed the jury that if it were found that the two Mosesians were engaged in a joint enterprise, the negligence of one joint-enterpriser would bar a recovery by the other, or his heirs or personal representatives, and that if they were engaged in a joint enterprise and the evidence satisfied the jury that Suren P. Mosesian was guilty of negligence which proximately contributed to the happening of the accident and injury to his father, such contributory negligence of Suren P. Mosesian would bar appellants' right to a recovery in this case. We have concluded that these instructions correctly limited the phrase "some one else's negligence, other than the negligence of Paul A. Mosesian himself", in the instruction complained of, to the negligence of Suren P. Mosesian and to no other person, removing the main objection to this instruction. We are of the opinion that taken as a whole the instructions did not mislead the jury and that the verdict was in accordance with the weight of the evidence.

Because one instruction of itself is not a true and correct statement of the law, furnishes no ground for a reversal of the judgment where the instructions taken as a whole do not mislead the jury on the law of the case. In *Douglas* v. *Southern Pac. Co.*, 203 Cal. 390 [264 Pac. 237, 239], it was said: "Jurors are presumed to be persons of common intelligence and capable of comprehending the ordinary use of language as applied to the particular proposition under consideration and in reference to which it is employed. We will not assume that they may not have

understood the charge as we understand it. The instructions must be considered in their entirety, and if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole unobjectionable, even though by selecting isolated passages from single instructions they may in some respects be amenable to just criticism."

The language of the Supreme Court in the case of *Callet* v. *Alioto,* 210 Cal. 65 [290 Pac. 438, 441], furnishes us sufficient grounds for an affirmance of the judgment in the instant case. "Appellant makes no contention that the evidence is not sufficient to sustain the verdict, but contends that certain instructions were erroneous. In this connection, appellant objects to parts of seven different instructions. It would add nothing to this opinion to quote the instructions of which complaint is made. It is sufficient to say that several of them use some unfortunate language and are rather incomplete and that several sentences are open to just criticism. However, we do not find any error sufficient to warrant a reversal. It must be remembered that the trial court is not required to state all the law applicable to a case in one instruction. All of the instructions must be read as a whole, that is, each instruction should be considered in connection with all of the other instructions, and if the charge harmonizes as a whole, and fairly and accurately states the law, a reversal may not be had because of verbal inaccuracies, or because isolated phrases or sentences are open to just criticism. Since the charge must be considered as a whole, an error in an instruction is cured, if, when the whole charge is taken together, the law is accurately stated."

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 21, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 26, 1932.